I'd like to reserve four minutes. Okay. My name is Adam Heater. I'm here on behalf of the appellant CLM and his parents Julie and Michael McNeil. This case presents a very unique set of facts for this court to address, one that this court has never had an opportunity to address in its prior First Amendment, specifically speech or campus school speech cases. It's a set of facts, a set of facts that appellees have, it's easily distinguishable from all the cases that they've relied on in both the district court opinion and in their briefing. It's a unique set of facts that immediately distinguishes this case from all the cases that have heretofore come and been decided in this line of jurisprudence by the Ninth Circuit. Well you're distinguishing this from Weiner because of the intent of the speaker. Absolutely. I mean that's that's the only real distinguishing fact. You've got off-campus speech that relates to the potential for violent act that's directed at students at this school's campus, but you want us to view it from the lens that because the speaker never intended it to be transmitted to anybody, the school shouldn't be able to regulate it in any form? Absolutely. Even when it's brought to the school's attention through no misdeed of their own, they are told there's a student out there who's created a hit list, as it's characterized, that affects 22 students who currently go to this school by a student who currently goes to this school and a teacher. The school should be not permitted to take any regulation that might include not letting the student return to campus until it's clear that he doesn't pose a harm. Well he also says they must die, right, in the journal, and he lives near the school, and when they search his house he has guns. So they should do nothing? There are guns in the home. Just to be clear, he did not have any operable guns in the home, and when the sheriff went there, I just want to be clear because it's actually an important factual distinction in the record, the sheriff found there was there was no steps taken to enforce this, there was no... Right, and so he didn't get charged with a criminal offense. Correct. But you also have an Oregon statutory notification requirement to parents of the students identified on, and so once the school district learned of the hit list, as it were, was it compelled under Oregon statutory notification to notify the parents of those students identified on the hit list? Let's read the language of that statute. The language of the statute says, a superintendent of a school district who has reasonable cause to believe that a person while in school is or has been in possession of a list that threatens harm to other persons shall notify A, the parent or guardian of any student whose name appears on the list as a target of the harm, and B, any teacher or school employee whose name appears on the list as a target of the harm. We've identified some additional statutory sections in our briefing that show that this while in school is crucial. It means within school property, and absolutely, my answer to your question is absolutely. There was a trigger here, had this been found in school, and I want to go back to a comment that you made right at the beginning, which is there was this hit list that was being brought to school. In fact, that's not the case here at all. And we can... I know he didn't bring it to school. His mom found it, she told her long chain, but it got to the school. The school was notified, and it seems that in terms of balancing the regulation of his speech and the effect on him and the school's duty to the health and safety and the operation of the school, that letting them respond to that information is not such a violation of... whether it was his intent that they learned it or not, once they knew it, wouldn't they be obligated? I think Weinar says that, you know, it's an explicit finding in that case that when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of Tinker. Two responses to that. Again, Weinar was not dealing with speech that was private speech that the speaker never... and it's not just intent. He never, the speaker here, never disclosed that to any third party, much less directed at the school. Never. This was private journaling that never intended to see the light of day. And he did nothing. It would be one thing if he didn't intend it, but then took actions that would inevitably cause it to be disclosed to third persons. Well, okay, but I think that goes to the test that we employ. And if the test is always that the person never intended anyone to see it, when you're just finding reasonable foreseeability, do we consider whether the threat of violence is reasonably foreseeable to the school upon learning of the threat? Whether the threat of violence would have been reasonably foreseeable to the student when he created the threat? Or whether the threat of violence would have been reasonably foreseeable to the student when he created the threat, if the threat were to be conveyed to the school, or some combination thereof? I'm pretty sure that a test that when people write these things, I mean, I can't see it being a feasible test that we only go to the mind of the student, that he never intended someone to find out. Sure. I'm glad your honor answered this question because it highlights exactly why, in our case, we do not believe this even needs to get to the wine our nexus and foreseeability test. This transcends the school speech cases, this transcends the true threat speeches cases, because this was truly private speech, never intended to be disclosed, and never intended by the, or, and the speaker never, in fact, disclosed to any third party. So, your question goes to, whose perspective are we looking at when we judge this foreseeability test? Well, if you look at the cases, some cases look at it from the perspective of the student. Some cases look at it from the perspective of the school board. In fact, in the CR case, they look at it from the perspective of the school. Well, so, is it your view that, okay, first, because the mother's concerned, she sees it. I mean, there's other concerning things in the journal about him threatening to kill his parents and, and when he's talked to by the police, there's a lot, but that wasn't, the mother shows it to the therapist, the therapist feels that she has to report to the police, the police report it to the school. Is it your position that the school should have done nothing? No, that is not our position. The school had the right. In fact, when the school found out, he was already in police custody. He was already being given, at the hospital, taking a mental health exam. There were steps. I want to disabuse one thing. This was not about preventing a safety concern at that point. He was already in custody. They expelled him for a year under threat of criminal prosecution. If school, if assessing the school threat was really so important, they would have administered the STAT, the student threat assessment test. They never did that. This was a punitive measure. This was not about taking some immediate emergency steps to assess the situation. They did that, and we're not contesting they had the right to do that. So the question here isn't really whether the school could respond to the information. It was how they responded. Exactly. And your argument isn't that they responded to protect student safety, but rather they continued to expel him for a prolonged period after he was already found to not be a threat as a form of punishment because it created all this havoc. That's exactly right, Your Honor. And so we should be evaluating not the fact that they responded to his speech, but the extent to which they responded. And that should be balanced against both his intent for it to be heard, the nature of the speech, and how long they carried out the punishment. That's exactly right. I want to go back to a question you asked a moment ago, Your Honor, about, again, whose perspective are we judging this foreseeability? Is it from the perspective of the student or from the perspective of the school? Well, again, in all those cases, in the CR case, in the Weiner case, in all these cases that are cited or relied upon and listed in the Weiner case, they looked at that question at the time that the disclosure of the speech was made to a third party. And when it's made to a third party, then it really doesn't matter whether you're asking it from the perspective of the student or the school. It's would a reasonable person anticipate, reasonably foresee that this speech is going to, quote, reach the school. Here, where it was never disclosed by the speaker to a third person, we can't, how could we possibly ask that question but from the perspective of the student, which is exactly why this line of cases, where the speaker never intended that speech to be disclosed to a third party, much less direct to the school, that's why this is not even applicable to this Weiner nexus and foreseeability test, but rather fails this threshold test that's articulated, as we noted in the Weiner, excuse me, not the Weiner, the Porter case and the Bell v. Itawamba case, which is, if this is private speech that the speaker never intended or took steps to disclose to any third person, much less direct at the school, we don't even reach any of these other tests. We don't reach Tinker, we don't reach the nexus, we don't reach the foreseeability test, because that is so clearly subject to the default strict scrutiny protections of the First Amendment. And, and I... But there's a, there's circumstance, I mean, these cases are very circumstance driven. I mean, if the, if the student's speech had been even hate speech, where he just wrote, you know, unspeakably nasty things about some protected group, but never intended anyone to see that, and somehow that came to the school's attention through no intention of his own, to punish him for that one, it would cause no, it would only be the school publicizing it that would cause the havoc. I could see your point, where his intent there should weigh very strongly in whether he should be disciplined for something that's essentially his thoughts, he just happened to put them down on paper. The other end of the spectrum, the thoughts here are, I'm going to kill people. Now, whether he intended to carry that out, once the school is notified that someone has written down that they have a hit list, specifically not just, I hate all students, not a generic, but 22 students are named very specifically with, they must die, and he is in a home that has weapons, and while they, they were taken and the immediate threat was quelled, the school's response, at some point, should we suspend him for a day, for a week, make sure he has mental health counseling, that there is no continuing threat here, would seem a rational and reasonable response to their learning of this speech. I do feel that there's some concern here that to then expel him for a year, and to leave this on his record, is more punitive than responsive. And, and, and there's some concern that where does the school get to discipline beyond what seems necessary to carry out their functions? Yeah, and, and your Honor, again, we have not contended that they had no right to take emergency measures, and we've pointed out that he was already in custody, those emergency measures were in place. But to go back to your question that this is a, a circumstance-specific driven inquiry, I want to read from... They didn't keep him in custody, though, did they? No, but he was, they put in place an emergency, we're going to keep him off campus for a week until we have a chance to assess this. Okay, but at the time of the hearing, he... At the time of the hearing, he was no longer in custody. He was not in custody. That's correct. And he still lived close to the school, and he still would be a student at the school, right? Correct. Okay. But that was already the point at which the police and every other person who had found this, there was no weapons in his locker, the sheriff had already found there was no identifiable threat, it was a safe home, the psychologist, the police weren't going to charge him with anything, there was nothing. It was, it was a blank, if you will. Well, the psychologist that said he would be safe to go back to the school after he did his year, but that psychologist that gave an opinion didn't know anything about the graphic pictures of him killing his parents and that, his suicide threats, right? So the opinion is limited to what that person knew. Right. And that psychologist was several months later, and I'm talking, that was, we're talking before even the hearing, when the sheriff and the school had already found that there was no identifiable threat here. I see that I've got about two minutes left. I'd like to reserve those for Rebecca. Okay, thank you. Good morning. Good morning. May it please the court, Blake Frye for the appellees. If I could just for a second review the timeline of events, because I think they're, they're obviously important. So on an evening during the school year, the police warned the appellee school district here that one of its high school students had created a hit list. The next day, the police go to the school with a copy of the hit list. They also, that the prior evening, the police also informed the district that they had confiscated guns and ammunition from the home. The guns, at least one of them was a working firearm. They weren't inoperable. That's, that's not accurate. Anyway, the next day that they go to the school with a copy of the hit list, they show the copy of the hit list. And it's titled My Hit List, as you've noted. It says, you know, all these people must die, and I am God. They, the police also tell the administrators that the hit list was contained, included in a notebook that had other graphic descriptions of violence and depictions of violence, including in-school violence, and that it also contained, you know, a suicide note and the other things that you've seen in the, in the, in the notebook. Later that same day, the school learns that the student had been released from custody. This, the school also learns that day. And again, as you've noted, they, the school knows that he lives close by. They also learned that the parents have taken back to the house, the guns and ammunition that had been confiscated the day before. It's when the school learns this, that they call, they call the parents and they say, the student is barred from campus for the time being he's suspended. And of course, ultimately that suspension turns into an expulsion. They notify the 21, is it 21 people on the list or 22? I think it's, I think it's 23 and I think one of them was a teacher. Okay. So they notified all those people and then somehow it ends up in social media and. Correct. I mean, once, correct. And once, right. Once, I mean, once they notify 22 or 23 people, a word inevitably gets out and this, this causes the school district and the police issued a press release of their own. The district issued a press release because they, of course, the word had gotten out and, and their concern is primarily to, to inform people, listen, if you haven't been contacted by us, that means that you're, you know, your child's name is not on the list. I, okay. But I, cause I just want to get to what, what I feel like the point here is, I mean, that, that the argument that, that any response to this would be unconstitutional because it's, it's, it's his free speech and he never intended anyone to see it. It's basically his thoughts. I think to some extent the appellees have, appellants have conceded that, that the school's response at least to threats of violence is not necessarily unconstitutional once it came to their attention. But so what might've been initially a constitutional response where they, they notified people, they took certain steps and they at least temporarily barred him from campus until they were satisfied that he did not pose a threat. Can that then become an unconstitutional response to his speech by becoming punitive instead of protective of their role as the, the, the school administration to continue to bar him from campus when he's not posing any threats, that it would actually punish him, him for speech that he made, that he never intended anyone to see, but by the school's acts of having to publicize it created the havoc that naturally ensued from that. The parents, you know, coming in and complaining and, and so that justifies keeping him off campus for more than a year or a year and leaving this permanently in his record when there's no evidence he ever really intended to just his thoughts. Does it then become unconstitutional at some point to do that? Well, first of all, we've never agreed that he wasn't a threat, but one of the things addressed in Weiner is that it doesn't matter. You know, the student in Weiner had alleged that his comments threatening a school shooting were only a joke, that they weren't serious, and what the court in Weiner said was, well, we don't have to discredit that argument. It doesn't matter. The point is that when the school received the information, based on the face of that information, it was reasonable for the school to proceed as if the threats were not a joke. Same here. When the school received the hit list, it was reasonable for them to proceed as though it were serious, and that's what they did. And everybody else who saw the hit list proceeded as though it was a serious two, including the mother, who informed, showed the hit list and the other parts of the notebook to her therapist, who then called the police, and then the police warned the school. But once you concede that some sort of discipline is constitutional, it doesn't matter at that point the degree of discipline that you're talking about. And this is another issue that was raised in Weiner. Weiner, the student in Weiner had objected similarly to the expulsion. He was expelled for 90 days, and he sort of made an argument that that was punitive. And the court said, you know, again, we don't, it's not the court's business to assess the propriety of the particular discipline. If any restriction of the speech is constitutional, then it's irrelevant whether you're talking about a 10-day suspension or a 90-day expulsion or a one-year expulsion. Counselor, can I interject a question? We addressed this issue in part in Levine. In Levine, where the student brought his threatening material to class, we upheld the constitutionality of the response. But at the end of our opinion, we said that said, after the threat had dissipated, it was unconstitutional to keep in his file a permanent record of his behavior. And I ask you to address that as to why at least a permanent record of his episode wouldn't be unconstitutional under Levine. Well, the basis for the expulsion, to the extent that it's based on the disruption that the Hit List caused, undoubtedly caused, is controlled by Right. You have, it's still in his file that this happened. And Levine, the court specifically carved that out and said that that portion of the school's response was beyond what was constitutionally required by keeping a permanent record in that particular student's file about what happened when all of the concerns had been quelled and and he was no longer a threat to the school or anyone else, that to have that be something he had to carry with him going forward was was an unconstitutional extension of the right of the school to regulate the speech. Why wouldn't that apply here as well? Well, there's no evidence here that there was any, that this was punitive. This is... Sure it is. They very specifically said all the disruption he caused and the parents who were coming and arguing that if he came back to school they'd pull their kids out and they were punishing him for all of the aggravation he caused them, not because there was ever any evidence he was going to carry this out, because there wasn't. Well, but it's, it's whiner, it's whiner in the Tinker standards that control. If, if, if there is, if the speech is reachable by the school in the first place, then, then, and it caused the disruption or interfered with the rights of other students to be secure and to be let alone, then the speech can be restricted and that includes the discipline. Any time a discipline is issued, whether it's a suspension or an expulsion, that's going to be in a student's record. Does it have to stay in their permit? Under Levine it's not. Excuse me? He said according to Levine it's not. Under Levine it's not. We affirm the district court's injunction prohibiting the or maintenance of any such negative documentation, documentation in his file. Well, I'm not, I'm not sure what the basis of that rationale, though, is there, especially when, again, we have... It's the law of our circuit. You can read the opinion that is very well set out. Well, but... Judge Fischer wrote it. No, but... I, I think that, that the point, though, that, that, that's made there and that I've been kind of trying to make here is that in this spectrum of it, is it simply because what we would find an immediate response to an immediate threat is constitutional and perhaps even a suspension or an expulsion for some period of time to both confirm the threat no longer exists and perhaps to punish is okay, but it, does it become, is it constitutional for whether it's punitive or safety measures that we, we, that we just have to throw up our hands and go, no, if they could respond in the first instance, then everything you do after that is beyond the, the scope of the court to look at it and go, now you've gone into unconstitutional territory. Now you are punishing someone for speech beyond what was reasonable and necessary. It is no longer the least restrictive means. You, you, you've gone beyond. I, if it caused a disruption according to Tinker standards, then the speech can be restricted and that includes any discipline. As long as any discipline is constitutional, then again, the degree of discipline doesn't matter unless you get into some sort of agreed, you know, due process violation where... So, and they do make some contentions on that. I, I think they, they do say first that you for, went the stat protocol in determining whether CLM's hit list amounted to a credible threat. That was one thing they, and then, but then the process, I think they made a, they claimed that he was in a, that he was in a class of one and that he, other people got lesser discipline. So they do make some contentions along that line. They conceded, they have conceded the equal protection claim and the procedural due process claim. And those protocols are not meant to assess the propriety of any discipline. They're only meant to assess whether, they're just tools that the school can resort to if they need to, to assess whether somebody is a danger. They're not meant to assess whether, you know, to assess the propriety of any discipline. Okay. So in terms of if the school can notify people and if we get past all of that, that based on that, then you have the hearing, how, how in your view does the court evaluate the hearing that was given in the one year? What role does the court have in that? So, so what Weiner says is that assessing whether off campus speech can be restricted by the school is assessed in two steps. The first step is deciding, is an assessment of whether the speech is reachable by the school in the first place, even though it originates off campus. And in Weiner, the court mentioned a couple of threshold tests that other jurisdictions had used, but it rejected those tests specifically in cases when the speech at issue amounts to an identifiable threat of school violence. And so there is, when you have an identifiable threat of school violence like we have here, there is no more threshold test. The test is deemed passed because an identifiable threat of school violence is always a legitimate school concern. And then step two is, does the identifiable threat of school violence, or does the discipline over that comport with, in particular, the standards of Tinker? And that's what the district court did here was find that the circumstances and the speech at issue here was in relevant respects, identical to that at issue in Weiner. So it found accordingly that the off campus speech here, the identifiable threat of school violence was, first of all, reachable by the school, just because of the nature of the speech, and that the discipline comported with Tinker, because that speech had caused a disruption, because it had interfered with school activities, because it had interfered with the other students' rights to be secure and to be let alone. So how would you fashion the reasonable foreseeability test? Well, again, Weiner says that we don't employ any test if the speech at issue is an identifiable threat of school violence. And one of the things that the district court said in response to a similar argument is, you know, if we accept the argument that the school couldn't have done anything because it was not reasonably foreseeable, but the hit list would find its way to campus, that effectively insulates from discipline the would-be school shooter who plots secretly in his home and doesn't intentionally direct his plans towards anybody. And that's obviously an untenable outcome. The Weiner decision came after Levine, and although in Levine the court looked at the scope of the punishment and found that it extended beyond what was needed or constitutional, in Weiner the court does look at that while holding that the Douglas County actions didn't violate the First Amendment, they were not necessarily implying approval of the particular response, and Judge McEwen goes on to say it's not the responsibility of the court to parse the wisdom of their actions, but rather just to determine whether they were constitutional. So at least suggesting in that case that although Levine got into what the school district did and found that the permanent record aspect of it was unnecessary and therefore not justified constitutionally, Judge McEwen seems to be indicating what I think your position is, whatever they do in response to what's a constitutionally permitted response to the threat, it's not for the court to come in later and judge it? Correct. I mean, that's how I read Weiner. It's exactly that way. It says, listen, there is aspects of this punishment that is maybe more than what's necessary, but our job is to decide whether the discipline in the first place is constitutional. And once we've made that decision, we don't get into the degree of discipline. All right. Thank you. The appellees have put the cart before the ox. So long as anything can be labeled as an identifiable school threat, you don't have to go through any of this analysis, you don't have to go through the foreseeability, the nexus, the threshold test we advocate, because an identifiable school threat is an identifiable school threat, and that's the end of the analysis. The Proctor case stated, private writings made and kept in one's home enjoy the protection of First Amendment as well as the fourth. For such writings to lose their First Amendment protections, something more than their accidental and unintentional exposure to public scrutiny must take place. That's exactly what we are dealing with here. This was never disclosed to a third person. In fact, in the Porter case, I said Proctor a moment ago, Porter case, that actually was disclosed to a third person. But private writings in your home that aren't intended for anyone else to view are protected by the First Amendment. Great. And what if that, in this case, it was not a specific plan, but what if it was? What if it was more of an outline? I'm going to go to the school on this date. I'm going to enter these doors. I'm going to bring these weapons. I'm going to shoot these students and find them. And all of that was in his private journal with no intent for anybody to ever see it. But it was discovered and brought to the school's attention. They can do something, can't they? I don't know. That's not the case before us today. What we do know is that Mr. CLM never took any steps. Well, that person hasn't taken any. They've only written them down. He could just as easily argue. I was just thinking about it. It was just, it was a fantasy. It was, you know, it wasn't something I was actually going to do. In this case, you've got these people must die and specific names. So it's not just generic. It's very specific. There's a nexus to the school that satisfies the first step of Tinker. You've got something that identifies students, the places. I know you describe them as just people he knows, but they're all students at the same school. That's the sufficient nexus. And what you're describing, Your Honor, is speech that would qualify as a true threat and therefore not be entitled to the First Amendment protection. But again, under the Porter test and others that we've cited, to be a true threat, to lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly communicated to either the objects of the threat or a third person. Importantly, whether a speaker intended to communicate a potential threat is a threshold issue and a finding of no intent to communicate obviates the need to assess whether the speech constitutes a true threat. So the answer to your question is no. Maybe the police under that circumstance could do something. The school cannot. Not a true threat, so not protected speech. Again, it's his thoughts that he's having. It's still violence directed at other students at the school. So it's got First Amendment protections, but the First Amendment still allows for regulation in the least restrictive means to provide for balancing of your rights and what, how it's going to affect these other people. And so again, the school has a responsibility here. And I think you've already acknowledged they could do something. I see that I've gone over my time. Can I answer the question? Yes. The school, if there is a true threat, they can... No, based on this speech... Sure. And they did. And they took steps. And we haven't contested that it was okay. And when they found that out, he was already in custody. The police had already found there's nothing here to arrest him for. There's no actual threat here. And the school went above and beyond its own policies. It went above and beyond the own statute and informed everyone. Everyone and their parents and their children and the entire community. They published this in the whole entire thing in contravention of their own policies and of the statute. Unless there are other questions from the panel, I'm happy to... I think you've answered our questions. This matter will stand submitted.
judges: Fisher, Callahan, Bencivengo